UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSEPH F. SANDERSON,

                Petitioner,

    -vs-

DAVID M. UNDER, SUPERINTENDENT
WYOMING CORRECTIONAL FACILITY

                Respondent.

_____

**DECISION AND ORDER**

**No. 11-CV-01098(MAT)**

## I.   Introduction

*Pro se* Petitioner Joseph F. Sanderson ("Petitioner") has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered September 11, 2006, in New York State, County Court, Orleans County, convicting him, after a jury trial, of two counts each of Criminal Sexual Abuse in the First Degree (N.Y. Penal Law ("Penal Law") § 130.50[3]), Sexual Abuse in the First Degree (Penal Law § 130.65[3]), and Endangering the Welfare of a Child (Penal Law § 260.10[1]).

## II.  Factual Background and Procedural History

An Orleans County Grand Jury charged Petitioner with three counts of sexual abuse in the first degree,[1] two counts of

---

[1] Prior to summations, the defense moved for a trial order of dismissal. Trial Trans. [T.T.] 386-389. The People conceded that they had not made out a prima facie case with respect to one count of first degree sexual abuse, as alleged in the fourth count of Ind. No. 06-69. Accordingly, the trial court dismissed that count. T.T. 389.

endangering the welfare of a child, and one count each of criminal sexual act in the first degree and one count of criminal sexual conduct against a child in the second degree. The Grand Jury later charged Petitioner with three additional counts of criminal sexual act in the first degree. <u>See</u> Ind. Nos. 06-59 and 07-25 at Resp't Ex. B. These charges, set forth in two separate indictments, were consolidated for trial.

Prior to trial, a <u>Huntley</u>[2] hearing was conducted on December 21, 2006 before Judge James P. Punch. At the hearing, Investigator Kenneth M. Strickland of the Orleans County Sheriff's Department testified that Petitioner came to the Sheriff's Department on June 22, 2006 and spoke with him. Hr'g Mins. [H.M.] 5-6. He testified that, at that time, Petitioner was not in custody. H.M. 6. After a fifteen to thirty minute conversation, Investigator Strickland typed out Petitioner's statement, and Petitioner read it over and signed it. H.M. 8. Investigator Strickland testified that he made no threats or promises in exchange for Petitioner giving his statement. At no time did Petitioner ask for an attorney or request that the conversation with Investigator Strickland end. H.M. 9. According to Investigator Strickland, Petitioner was at the Sheriff's Department for about thirty to forty minutes. H.M. 10. At Investigator

---

[2]
A <u>Huntley</u> hearing is held to decide whether a defendant's statement is voluntary. <u>See</u> <u>People v. Huntley</u>, 15 N.Y.2d 72 (1965).

Strickland's request, Petitioner returned to the Sheriff's Department on August 23, 2006, and spoke with him again. Investigator Strickland did not make any threats or promises to Petitioner on August 23, 2006. H.M. 12. Investigator Strickland did not arrest Petitioner that day. H.M. 12.

At the close of the hearing, the court found that Petitioner's statements on both dates were voluntary, and that there were no promises made to Petitioner in return for his statements and there was no evidence of coercion. Accordingly, the court denied Petitioner's motion to suppress his statements. H.M. 52-53.

On May 7, Petitioner proceeded to a jury trial before Judge Punch.

**A.    The Trial**

**1.    The Prosecution's Case**

Amanda W. ("Amanda") testified that she has three children with different fathers: A.W., J.S. and T.S. Petitioner is the biological grandfather of T.S. A.W. and J.S., although not biologically related to Petitioner, consider Petitioner and his wife Thomasa to be their grandparents. T.T. 200-202, 212, 227, 296-97.

When A.W. was 7 or 8 years old, while she was at Petitioner's house, Petitioner rubbed A.W.'s "vaginal area" over her clothes. T.T. 233, 237. At that time, A.W. "didn't understand what he was doing," and A.W. did not tell anyone. T.T. 238. Around Christmas

2003 or 2004 when A.W. was 9 or 10 years old, A.W. stayed over night at Petitioner's home. T.T. 238-239. During that visit, A.W. awoke to find Petitioner pulling down her pants. T.T. 238-239, 241. On another occasion when she stayed over night at Petitioner's house, A.W. awoke to find Petitioner rubbing her vaginal area. T.T. 243-244. After one of these encounters, Petitioner told A.W. to "keep it a secret." T.T. 248.

On Friday, May 12, 2006, Amanda dropped her three children off at Petitioner's house around 6:00 or 7:00 p.m. T.T. 212. At about 9:00 p.m., Thomasa went to the grocery store with J.S. and T.S., while A.W. stayed at home with Petitioner. T.T. 228. At that time, Petitioner tried to kiss A.W. but she moved her head and he kissed her cheek. T.T. 228-229.

After J.S. returned from the store with Thomasa, she went to bed in a guest bedroom that she shared with A.W. that night. T.T. 300. At some point, Petitioner came into the guest bedroom, reached under J.S.'s pajamas, and touched her "private," "between [her] legs." T.T. 309-310. Petitioner then took J.S. outside the bedroom and touched her "private" with his hand and "[h]is tongue." T.T. 311-312. Petitioner also "put his private in [J.S.'s] mouth." T.T. 312. J.S. described Petitioner's private as the location on his body where Petitioner "goes to the bathroom." T.T. 313. Following J.S.'s encounter with Petitioner, she went back to bed. T.T. 314. The next morning, J.S. told A.W. what had happened.

T.T. 246, 314.  A.W. spoke with her friend who convinced her to go to the school's guidance counselor.  T.T. 246.  After A.W. spoke to her guidance counselor, Child Protective Services ("CPS") came to see her.  T.T. 246-247.

Orleans County Sheriff's Department Investigator Strickland spoke with A.W. and J.S. in June 2006.  T.T. 349.  Two days later, Investigator Strickland drove to Petitioner's house with CPS case worker Donna Snell ("Snell").  T.T. 351.  Investigator Strickland told Petitioner that he was investigating a sex abuse case involving two children who had been to his house and asked if Petitioner could come to his office to speak with him.  T.T. 351. On June 22, 2006, Petitioner went to Investigator Strickland's office for an interview.  T.T. 353-354.  Petitioner was not in handcuffs when he spoke with Investigator Strickland.  T.T. 353. Investigator Strickland told Petitioner that Petitioner's granddaughters had alleged that Petitioner had touched them. T.T. 356.  During the course of their conversation, Petitioner stated that he had touched J.S. once, but that he had not touched A.W.  T.T. 356.  After their conversation, Investigator Strickland typed out Petitioner's statement, gave him an opportunity to read it, and Petitioner signed it.  T.T. 356-359.  Petitioner's statement was introduced into evidence without objection.  In that statement, Petitioner stated that, "around two months ago" he had "sexual contact" with J.S.  He stated further that, "[he] was alone

with [J.S.] and [he] started to horse around with her and [he] put [his] hands on her vagina and rubbed it and on her belly." T.T. 359-360.

Petitioner came to Investigator Strickland's office a second time on August 23, 2006. T.T. 363. Petitioner was not in handcuffs on that date. T.T. 364. Investigator Strickland told Petitioner that he had spoken to A.W. and J.S. again and that "some of the things weren't really adding up." T.T. 364. Investigator Strickland asked Petitioner whether anything else had happened with A.W. or J.S. T.T. 364. In response, Petitioner stated, "I really don't recall anything else that I did, but I do block things out and you know I can't guarantee that nothing else happened. I do block things out." T.T. 364. When Investigator Strickland asked Petitioner whether there would be a reason for the girls to lie, Petitioner stated that "he didn't think there would be a reason" for them to lie and "he didn't believe they were liars." T.T. 364.

Jack Coyne, M.D., a forensic pediatrician, testified that he examined J.S. on June 6, 2006. Even though the general exam was normal, he could not testify whether or not she was sexually abused. According to him, in at least seventy percent of cases in which children are sexually abused, there is no objective physical evidence of sexual abuse. T.T. 327-334. Dr. Coyne testified that the lack of objective evidence of the manual rubbing and licking of the vagina by Petitioner was exactly as expected, as the hymenal

tissue in children is seldom disturbed by this type of touching.
T.T. 334-335.[3]

## 2. The Defense's Case

Petitioner testified in his own defense, and also called his
wife Thomasa as a witness.

According to Thomasa, on Thursday, May 11, 2006, Amanda called
Thomasa and asked Thomasa if Amanda's children could spend the
weekend at Thomasa's house. T.T. 399. Thomasa told Amanda that
they could, provided that A.W. watched J.S. and T.S. while
Petitioner and Thomasa were at work. T.T. 399. Thomasa picked up
J.S., A.W., and T.S. on May 12, 2006 and arrived home at around
6:00 p.m. T.T. 397-398, 401. She then went out shopping with J.S.
and T.S., while A.W. stayed at home. T.T. 401. When she returned
home at about 8:15 p.m., A.W. was watching TV. T.T. 401. Thomasa
then got the children ready for bed. T.T. 402. A.W. and J.S.
slept upstairs, while T.S. slept downstairs on the sofa. T.T. 402.

Thomasa and Petitioner then went to bed in their bedroom.
Thomasa woke up at about 3:00 a.m. when Petitioner went to the
bathroom. T.T. 414, 422, 467. When Petitioner returned to his
bedroom about 3 to 5 minutes later, he spoke with Thomasa and then
went back to sleep. T.T. 422, 424, 464, 467.

---

[3]

A.W. would not allow the Child Advocacy Center to do a medical examination
because she did "not appreciate strangers examining [her]." T.T. 247.

Petitioner testified that at about 5:00 a.m., he went to work. T.T. 467. Thomasa testified that when she left for work that day, the children were still asleep. T.T. 424-425. When Petitioner returned home at about 11:50 a.m., A.W. and J.S. were watching TV. T.T. 468. According to Petitioner, A.W. asked Petitioner if he was going to take them to McDonald's. T.T. 468. Petitioner told A.W. that he would take the children to McDonald's after he took a half hour nap. T.T. 469. While Petitioner was trying to nap, A.W. twice asked Petitioner when they would be leaving. J.S. also separately asked Petitioner when they would be leaving. T.T. 469-479. Eventually Petitioner drove the children to McDonald's, stopping at Thomasa's place of employment on the way. T.T. 470. When A.W. became upset by this, Petitioner explained to her that he needed to get money from Thomasa for lunch. T.T. 470.

After the children ate lunch, Petitioner delivered a hamburger to Thomasa. T.T. 471. Thomasa told the children to let Petitioner take a nap when they returned home. T.T. 471. In response, A.W. "copped an attitude and stormed out of the store" where Thomasa worked. T.T. 471-472. A.W. then insisted that she go home to her mother's house, rather than to Petitioner's house. T.T. 472. When J.S. and T.S. indicated that they wanted to stay at Petitioner's house, Petitioner told A.W. that he was not going to take just one child home. T.T. 472. When Petitioner and the children arrived at Petitioner's home, the children played outside. T.T. 472. About

five minutes later, T.S. told Petitioner that all the children wanted to go home. T.T. 472. When Petitioner asked T.S. why they had decided they wanted to leave, T.S. replied, "[A.W.] told us that we were going home." T.T. 473.

A few days later, Thomasa and Petitioner received a letter in the mail that accused them of child endangerment. T.T. 427, 478-479. After they received the letter, Investigator Strickland and case worker Snell came to Petitioner's home and spoke with Thomasa and Petitioner. T.T. 422, 427-428, 432. They told Thomasa and Petitioner that the complaint was against both of them. T.T. 432. Thomasa told them that the allegations were "all false," and after 15 or 20 minutes, left Petitioner's home. T.T. 432.

At some point, Investigator Strickland contacted Thomasa to schedule an appointment for Petitioner to meet with him. T.T. 434-435. Petitioner and Thomasa later drove to Strickland's office, where Petitioner spoke with Investigator Strickland while Thomasa met with a caseworker. T.T. 436, 448, 455, 482.

Petitioner confirmed that he went to Investigator Strickland's office on June 22, 2006, and understood that he could leave at any time and that he did not have to talk with him at all. T.T. 483-484. According to Petitioner, at the time he spoke with Investigator Strickland, Investigator Strickland was wearing a "tank top" with a badge around his neck. T.T. 479. Petitioner described Investigator Strickland as "stocky," "quite muscular,"

with "some mighty big arms" and "tattoos on both arms." T.T. 479. According to Petitioner, "just the size of [Investigator Strickland] would scare somebody." T.T. 479.

At the Sheriff's Office, Petitioner asked Investigator Strickland about the "severity of the charges" involved in the investigation. T.T. 455, 489. Investigator Strickland told Petitioner that he and his wife "could both go to jail." T.T. 455. However, Investigator Strickland told Petitioner that if he made an admission and went for therapy, he "wouldn't probably go to jail." T.T. 455. Petitioner testified that he "wanted to protect [his] wife," and was afraid that she would go to jail. T.T. 456. Because Petitioner had participated in therapy in the early 1970s,[4] he figured that it "would be easy." T.T. 456. Therefore, he "figured [he] would give [Investigator Strickland] a statement and go up and get the therapy and that would [be] . . . the end of it." T.T. 455.

According to Petitioner, Investigator Strickland suggested that he say "something about child sexual abuse" in his statement. T.T. 456. Although Petitioner knew that sexual contact with a 7-year-old child was a serious crime, he testified that it was his idea to state that he touched J.S.'s vagina, the touching "lasted about two minutes," he "knew it was wrong," and that he felt

---

[4]

Petitioner testified that he participated in counseling in 1972 after he tried to commit suicide. T.T. 492.

"ashamed." T.T. 484-485, 487-488. Petitioner testified that it was also his idea to state that he had sexual abusers in his family, and that although he did not think that he had a problem, he recognized that he "need[ed] help," and that he was "going to go out and get it right away." T.T. 485-487. Petitioner testified that before he signed his statement, he read a legend on his printed statement affirming that "all facts" contained in his statement were "true to the best of [his] memory and knowledge." T.T. 488. Petitioner also confirmed that no one forced him to sign his statement. T.T. 488-489. Petitioner maintained, however, that the statements that he made on June 22, 2006 and contained in his signed statement were false. T.T. 481.

Petitioner testified that he returned to the Sheriff's Office on August 23, 2006. T.T. 493. At that time, Petitioner denied telling Investigator Strickland that he did not remember touching the girls, and maybe he was blocking it out. T.T. 493. He further denied telling Investigator Strickland that he did not think that the girls were lying about their allegations. T.T. 494.

Petitioner testified that he had a good relationship with J.S., A.W., and T.S. before May 12, 2006. T.T. 440. Petitioner denied that he molested J.S. or tried to "feel [A.W.] up." T.T. 475-477.

### 3.  Verdict and Sentencing

On June 29, 2007, the jury found Petitioner guilty of two counts each of first degree criminal sexual act, first degree sexual abuse, and endangering the welfare of a child.  The jury found Petitioner not guilty of two counts of first degree criminal sexual act, and one count of second degree course of criminal sexual conduct against a child.  T.T. 581-583.

The court sentenced Petitioner to a determinate term of imprisonment of nine years and five years post-release supervision for each first degree sexual abuse count, a determinate prison term of five years and three years of post-release supervision for each first degree sexual abuse count, and one year for each count of endangering the welfare of a child.  Sentencing Mins. 8-10.

### B.  Direct Appeal

In a counseled brief, Petitioner appealed his judgment of conviction to the Appellate Division, Fourth Department on the following grounds: (1) his confession was involuntary; (2) the trial court failed to properly charge the jury on the issue of the voluntariness of his confession; (3) he was denied a fair and impartial jury because a deliberating juror was not discharged after she received an anonymous telephone call; (4) the evidence was legally insufficient to establish his guilt of the charge of Endangering the Welfare of a Child; (5) the verdict was against the weight of the evidence; (6) the prosecutor engaged in misconduct in

connection with his direct examination of one witness, and by referring to the victim as "honey" in a single question; (7) he was denied the effective assistance of trial counsel because he made erroneous statements in his opening, and he failed to request a jury instruction concerning the voluntariness of his statement; (8) he was denied his constitutional right to a fair trial because of cumulative effects of all errors at his trial; and (9) his sentence was harsh and excessive. See Resp't Exs. A, B. On December 30, 2009, the Appellate Division unanimously affirmed the conviction, and leave to appeal was denied on April 19, 2010. People v. Sanderson, 68 A.D.3d 1716 (4th Dep't 2009) (Resp't Ex. E); lv. denied, 14 N.Y.3d 844 (2010) (Resp't Ex. H).

### C. Petitioner's Motion to Vacate

In a motion dated April 27, 2011, Petitioner moved, pursuant to N.Y. Crim. Proc. Law ("CPL") § 440.10, to vacate his judgment of conviction on the ground that he received ineffective assistance of trial counsel because counsel failed to: (1) object to the admission of Petitioner's statement at trial; (2) request a jury charge on the issue of the voluntariness of Petitioner's statement; (3) object to the jury charge; (4) object to the court questioning a juror who disclosed that she had received a "chilling" telephone call from an unidentified caller; (5) move for a mistrial based on that telephone call; and (6) move to discharge that juror. See Resp't Ex. I. The court denied Petitioner's motion. See Resp't

Ex. L.  Leave to appeal was denied on October 12, 2011.  <u>See</u> Resp't Ex. M.

### D.    The Habeas Corpus Petition

This habeas corpus proceeding followed, wherein Petitioner seeks relief on the ground that he received ineffective assistance of trial counsel because counsel failed to: (1) object to Petitioner's statement to Investigator Strickland on June 22, 2006; (2) request a jury charge on the issue of the voluntariness of that statement; (3) object to the lack of a jury charge on the issue of the voluntariness of that statement; (4) object to the court's questioning of Juror #8 concerning a telephone call that she received from an anonymous caller; (5) personally question Juror #8 concerning that call; (6) move for a mistrial as a consequence of that call; and (7) move to discharge Juror #8.  <u>See</u> Pet. ¶ 22, Grounds One-Two (Dkt. No. 1).  Respondent filed opposition papers to the habeas petition (Dkt. No. 17-18), and Petitioner filed a Reply (Dkt. No. 19) thereto.

For the reasons stated below, habeas relief is denied and the petition is dismissed.

## III. The Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ."

-14-

28 U.S.C. § 2254(b)(1)(A); see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999); accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054 (1995). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048 (1984).

## IV. The AEDPA Standard of Review

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

## V. Analysis of the Petition

## 1. Ineffective Assistance of Trial Counsel

Petitioner argues, as he did in the state courts, that he received ineffective assistance of counsel because counsel failed to: (1) request a charge concerning the voluntariness of his confession; (2) object to the admission of Petitioner's statement

at trial; (3) object to the court's lack of a jury charge on the issue of voluntariness of Petitioner's statement; (4) object to the court's questioning of Juror #8 concerning the telephone call that she received; and (5) did not move for a mistrial based on Juror #8 mentioning that call to other jurors. See Pet. ¶ 22A-B, Grounds One-Two. These claims are meritless, and provide no basis for habeas review.

To establish ineffective assistance of counsel, a petitioner must satisfy the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. Second, the petitioner must show that counsel's deficient performance prejudiced his defense, id. at 692, which requires proving that, "but for" counsel's errors, there was a reasonable probability that the outcome of the proceeding would have been different. Id. at 694.

The Strickland standard on direct appeal is already "highly deferential," 466 U.S. at 689, but in the context of a federal habeas proceeding under AEDPA, the habeas court must apply a "doubly deferential judicial review" to a state court's decision on ineffectiveness claims. Knowles v. Mirzayance, 556 U.S. 111 (2009). Where, as here, the state court has adjudicated the merits

of the petitioner's claim, and 28 U.S.C. § 2254(d)(1) applies, "the question is not whether counsel's actions were reasonable," but instead "is whether there is any reasonable argument that counsel satisfied _Strickland_'s deferential standard." _Harrington v. Richter_, ____ U.S. ____, 131 S. Ct. 770, 788, 178 L. Ed. 2d 624 (2011). In applying these principles, the Court finds Petitioner's claims are meritless.

**(A) Petitioner's Ineffective Assistance of Counsel Claims Related to Petitioner's Statement to the Police are Meritless**

Petitioner argues that his trial counsel was ineffective because he failed to: (1) object to the admission of Petitioner's statement to Investigator Strickland on June 22, 2006; (2) request a jury charge on the issue of the voluntariness of that statement; and (3) object to the lack of a jury charge on the issue of the voluntariness of that statement. _See_ Pet. ¶ 22A, Ground One. These claims do not warrant habeas relief.

There is no merit to Petitioner's contention that he received ineffective assistance of counsel because counsel failed to object, at trial, to the admission of Petitioner's statement to Investigator Strickland on June 22, 2006. This is so because Petitioner has not identified any meritorious objection that his trial attorney failed to make. _See e.g._, _Loving v. O'Keefe_, 960 F. Supp. 46, 50 (S.D.N.Y. 1997) ("Counsel's failure to make objections during the trial is . . . a tactical decision. A reasonable

-17-

attorney might well choose not to antagonize the jury by making unnecessary objections. Furthermore, [the] petitioner does not point to any evidence that should have been objected to . . . .").

The record in this case reflects that Investigator Strickland testified at trial that Petitioner came to Investigator Strickland's office on his own accord, and was not handcuffed or under arrest.  T.T. 353-354.  Investigator Strickland also testified that he did not tell Petitioner that if Petitioner confessed, it would be easier for him and that his wife would not be charged.  T.T. 381.  Further, Investigator Strickland testified that Petitioner agreed to read and review his statement before signing it.  T.T. 357.  Because Investigator Strickland's trial testimony established that Petitioner's statement was voluntarily given, and because Petitioner had not identified any basis upon which counsel should have objected, the Court finds counsel's performance was not deficient and did not result in prejudice to Petitioner.

Similarly, there is no merit to Petitioner's related contentions that counsel was ineffective because he did not seek a jury instruction on the voluntariness of Petitioner's June 22, 2006 statement,[5] or object to the lack of a jury charge on the issue of the voluntariness of the statement.  Even assuming that Petitioner

---

[5]

As discussed *supra*, Petitioner admitted to having sexual contact only with J.S. in his June 22, 2006 statement.

would have been entitled to a jury instruction on the issue of the voluntariness of his statement and that counsel's performance was deficient for having failed to seek same, in light of the overwhelming evidence of Petitioner's guilt there is no reasonable probability that the outcome of the proceeding would have been different if the instruction had been given. The credible testimony of J.S. alone established that Petitioner touched J.S.'s vagina on three occasions, touched her vagina with his tongue, and placed his penis in her mouth.

Accordingly, Petitioner's ineffective assistance of counsel claims related to the voluntariness of his statement are meritless and do not warrant habeas relief. The state court's adjudication of these claims did not contravene or unreasonably apply Strickland. The claims are therefore denied.

### (B) Petitioner's Ineffective Assistance of Counsel Claims Related to Juror #8

Petitioner asserts that trial counsel was ineffective because he did not: (1) object to the Court's questioning of Juror #8 concerning a telephone call that she received from an anonymous caller; and (2) move for a mistrial as a consequence of that call. See Pet. ¶ 22B, Ground Two. These claims are meritless, and do not warrant habeas relief.

The record in this case reflects that, after the jury retired to deliberate, the court received a note from Juror #8, which stated, "I would like to speak to Judge Punch about an unusual

phone call this morning." T.T. 572. The parties did not object to the court questioning Juror #8, as a result of her note. T.T. 573. The following colloquy occurred between the trial court judge and Juror #8, outside the presence of the other jurors:

COURT:    Is this phone call related to this case in some way?

JUROR:    I have no idea.

COURT:    Why is it, at this point, causing you concern?

JUROR:    Because of what I've been hearing the last two days and people I've been around and it is just unusual.

COURT:    What was the nature of the phone call?

JUROR:    Well, I said "hello" and I didn't hear anything. So I said, "hello" again. And it sounded like an older man, an older man was whispering and said, he said, "hello." And so I said, "hello, who is this?" He said, "hello" again. I said, "who is calling?" And he said, "it doesn't matter."

And it was just a chilling phone call.

COURT:    All right. Is there, can you assure me that you can put it out of your mind in terms of --

JUROR:    Absolutely.

COURT:    Hold on. In terms of continuing with your deliberation?

JUROR:    Yes.

> COURT:   Okay.  Is there any reason why you can't continue to deliberate as a juror in this case?
>
> JUROR:   No.
>
> COURT:   All right.

After an attorney-only bench conference (T.T. 574), the court asked Juror #8 whether she had talked about the telephone call with any of the other jurors, and she stated:

> JUROR:   I spoke about it with the jurors wondering, I mean, is this just something that should even be brought up or?
>
> COURT:   It clearly should not be.  Please do not discuss it any further.  I can assure you that it has nothing to do with this case and that you should not consider the phone call as affecting you in any way.

The court then excused Juror #8 from the courtroom.  The parties indicated on the record that they had no objection to the court inquiring whether the phone call affected the other jurors, and instruct them not to discuss the call anymore.  T.T. 575.  At the court's direction, Juror #8 then re-entered the courtroom and the following colloquy occurred:

> COURT:   Ma'am, I just wanted to ask you one more question about something you said gave rise to the need to ask this.  And that was when you said, that the things you have been hearing in the last two days.  My question is simply this: I want to be sure that you are not hearing things about the case outside the [c]ourtroom?

```
        JUROR:      No.

        COURT:      Is what you are referring to simply
                    what's going on in terms of the
                    evidence that you have been hearing?

        JUROR:      Yes.
```

The court then called in the remaining jurors, and the following colloquy occurred:

```
        COURT:      Now Juror number 8 has indicated
                    that there was something she wanted
                    to talk to me about.  And she
                    indicated that she thought she might
                    have mentioned it to you folks.  And
                    I will simply instruct you, it has
                    nothing to do with the case and it
                    should not affect you in any way.
                    Does anybody feel that whatever that
                    was, that it will affect you in any
                    way in your deliberations and
                    continuing to be fair jurors in this
                    case?
```

T.T. 576-577.

The transcript indicates a "negative response from the jurors." T.T. 577. The court then stated, "[i]t looks like every juror has responded, no." The parties then confirmed that they had no additional questions. T.T. 577.

Petitioner argues that trial counsel was ineffective because he did not object to the court's questioning of Juror #8, as set forth above, and did not move for a mistrial. This claim is meritless because there was no basis for trial counsel to object to the trial court's inquiry to determine whether Juror #8 or her fellow jurors were qualified to continue to serve, and no basis

upon which to move for a mistrial.  Petitioner maintains in his petition (see p 8(a)) and his Reply (see p 7) that the trial court's inquiry of Juror #8 was "cursory" and that the trial court simply "dropped" the "subject" after Juror #8 "responded that she would be able to deliberate fairly."  Pet's Reply at 7.

This claim is belied by the record, which reflects that the trial court conducted, without objection from either party, a pointed inquiry of Juror #8 after she alerted the court to a phone call she received that morning.  T.T. 572-577.  Juror #8's responses to the trial court judge's inquiry established that she could "absolutely" put the call "out of [her] mind" and that it would not affect her ability to "continue to deliberate as a juror in [Petitioner's] case."  T.T. 574.  Further, after conducting the inquiry of Juror #8, the trial court judge questioned the remaining jurors, who confirmed, without remark, that the call would not affect in anyway their deliberations or their ability to continue to serve as fair jurors.  T.T. 577.  Finally, the court instructed the jury that the telephone call that Juror #8 may have spoken to her fellow jurors about had "nothing to do with the case" whatsoever and "it should not affect [the jury] in any way."  T.T. 577.  Juries are presumed to follow a court's instructions, and Petitioner has not pointed to any evidence to establish otherwise. See, e.g., Richardson v. Marsh, 481 U.S. 200, 211 (1987) ("[J]uries are presumed to follow their instructions.");  United States v.

Downing, 297 F.3d 52, 59 (2d Cir. 2002) ("Absent evidence to the contrary, we must presume that juries understand and abide by a [trial] court's limiting instructions.").

Accordingly, the Court finds no basis to conclude that defense counsel's performance was constitutionally deficient. Moreover, Petitioner's generalized assertion that "[he] was prejudiced by having Juror #8 remain[] in the deliberations" because the "receipt of the . . . 'chilling' phone call . . . might [have] preclude[d] her from rendering an impartial verdict" (Pet's Reply at 7) is speculative and conclusory in nature and thus falls far short of a demonstration that there is a reasonable probability that the outcome of his trial would have been different, but for counsel's alleged errors.

In sum, Petitioner's ineffective assistance of counsel claims related to Juror #8 are meritless and do not warrant habeas relief. The state court's adjudication of these claims did not contravene or unreasonably apply Strickland. The claims are therefore denied.

**2.   Petitioner's Remaining Ineffective Assistance of Counsel Claims are Unexhausted but Deemed Exhausted and Procedurally Defaulted from Habeas Review**

Petitioner's remaining claims -- that trial counsel was ineffective because he did not personally question Juror #8 and did not move to discharge Juror #8 (see Pet. ¶ 22B, Ground Two) -- are unexhausted for the reasons discussed below. Because, however, Petitioner would face an absence of state corrective procedure were

-24-

he to return to state court to exhaust these record-based claims, the Court deems them exhausted but procedurally defaulted from habeas review.

A federal court may not consider a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies. See 28 U.S.C. § 2254(b)(1)(A); see also Picard v. Connor, 404 U.S. 270, 275 (1971); Dorsey v. Kelly, 112 F.3d 50, 52 (2d Cir. 1997). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the "opportunity to pass upon and correct alleged violations of . . . [a] prisoner's federal rights." Picard, 404 U.S. at 275 (citation omitted).

With respect to Petitioner's first claim -- that trial counsel was ineffective because he did not personally question Juror #8 (see Pet. at p 8(a)) -- said claim was not raised on direct appeal or in Petitioner's motion to vacate. Because he raises the claim for the first time in the instant proceeding, the claim remains unexhausted.

With respect to Petitioner's claim that trial counsel was ineffective because he did not move to discharge Juror #8 (see Pet. at p 8(a)), this claim was raised in federal constitutional terms in Petitioner's motion to vacate but was not properly raised in his leave application to the Fourth Department. See Resp't Ex. M. Although Petitioner annexed a copy of his motion to vacate to his

leave application, he did not specifically reference that claim when he listed the "questions of law" upon which he sought review. Id. at p 2. Consequently, the Court finds Petitioner's claim unexhausted for purposes of federal habeas review. See Diaz v. Mantello, 115 F.Supp.2d 411, 416 (S.D.N.Y. 2000) (where Petitioner did not raise a particular claim in his leave application from denial of motion to vacate, while raising other claims at length, the omitted claim was not exhausted for purposes of federal habeas review because it was not presented to highest court that could review it) (citing Jordan v. LeFevre, 206 F.3d 196 (2d Cir. 2000); cf. Caswell v. Griffin, No. 10 CV-01498, 2012 WL 4827816, at *3, n. 33 (N.D.N.Y. Oct. 10, 2012) (where application for leave to appeal argues one or more specific claims but only makes passing reference to possible other claims found in attached briefs, the claims mentioned in passing have not been fairly presented to Court of Appeals) (citing Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991); Gross v. Superintendent Five Points Correctional Facility, No. 11-CV-00927, 2012 WL 4800976, at *3 (W.D.N.Y. Oct. 9, 2012) (same).

Petitioner may not now return to state court to exhaust his unexhausted ineffective assistance of counsel claims because he has already used his one right to appeal and one application for leave to the Court of Appeals to which he is entitled. See Aparacio v. Artuz, 269 F.3d 78, 91 (2d Cir. 2001). Collateral review of these claims by way of another motion to vacate is foreclosed because

these claims involve matters of record that could have been raised on direct appeal, but unjustifiably were not.  <u>See</u> CPL § 440.10(2)(c) (barring collateral review if claim could have been raised on direct review but was not).  As a result, the instant claims are deemed exhausted but procedurally defaulted from habeas review.  <u>See</u> <u>Ramirez v. Attorney General</u>, 280 F.3d 87, 94 (2d Cir. 2001).

A petitioner can obtain federal habeas review of his procedurally defaulted claims only if he demonstrates either (1) cause for the default and actual prejudice; or (2) that the Court's failure to consider his claims would result in a fundamental miscarriage of justice because he is actually innocent.  <u>Murray v. Carrier</u>, 477 U.S. 478, 496 (1986).  Liberally construing Petitioner's *pro se* pleadings, he asserts counsel's failure to object to the trial court's questioning of Juror #8 as cause for the procedural default.  <u>See</u> Pet. at p 8(a), Reply at p 7. Ineffective assistance of counsel can constitute cause sufficient to overcome a procedural default if the counsel's performance amounted to a constitutional violation, but "attorney error short of ineffective assistance of counsel does not constitute cause and will not excuse a procedural default." <u>McCleskey v. Zant</u>, 499 U.S. 467, 494 (1991); <u>see also</u> <u>Edwards v. Carpenter</u>, 529 U.S. 446, 451 (2000).  In this case, Petitioner's stand-alone ineffective assistance of counsel claim on this basis is meritless, and

therefore cannot constitute cause for the default (see discussion *supra* at section V, 1(B)). Because Petitioner cannot establish cause for the default, the Court need not consider prejudice. See Stepney v. Lopes, 760 F.2d 40, 45 (2d Cir. 1985). Moreover, Petitioner has not alleged facts to avail himself of the miscarriage of justice exception.

Consequently, Petitioner's claims are procedurally defaulted from habeas review, and are denied on this basis.

## VI. Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed. Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000). The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with

United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     June 26, 2013
           Rochester, New York